**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 21-310** |
| **DAVID ABELL** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Assistant United States Attorney for the District, hereby submits its sentencing memorandum in the above-captioned case.

## I.    <u>PRELIMINARY STATEMENT</u>

Defendant David Abell was the mastermind of a bribery and fraud scheme that involved at least a dozen participants, including numerous managers in SEPTA's Bridges and Buildings Department ("BBD") and two corrupt vendors who sold products to SEPTA. As the Senior Director of Maintenance, the defendant was the highest ranking member of the BBD, and should have known better than to engage in criminal behavior that corrupted his department. This scheme persisted for at least six years and, under the most conservative estimates, resulted in almost $900,000 in losses to SEPTA. The scheme did tremendous monetary and psychic damage to SEPTA, its employees, and the citizens who fund SEPTA through the payment of taxes and ridership fares. The defendant obtained approximately $100,000 in cash payments as part of the scheme and

brought other participants into the scheme who profited enormously at the expense of SEPTA. Such conduct calls for serious punishment.

This Court should also consider the defendant's agreement to plead guilty in a timely manner and his demonstration of remorse. For all the reasons discussed below, the government recommends a sentence at or near the lowest end of the guideline range of 70-87 months in prison.

## II.   SUMMARY OF THE CRIMINAL ACTIVITY

### A.   Introduction

The charges arose from the defendant's origination and participation in a fraud and bribery scheme involving managers in the BBD of SEPTA and vendors who supplied products to the BBD. The BBD is responsible for maintenance, construction, and rehabilitation work performed at various SEPTA locations. The defendant, along with Several SEPTA managers in the BBD used their SEPTA-issued credit cards ("P-Cards") to defraud SEPTA by obtaining cash and personal products from vendors who supplied goods to SEPTA. To cover cost of the products and cash provided to SEPTA employees, the vendors billed SEPTA for products that the vendors did not provide to SEPTA. The vendors generally billed SEPTA as much as double the amount provided to the corrupt managers so they could share in the criminal proceeds. The vendors provided the cash and products to SEPTA managers for two reasons: (1) to generate and share fraud proceeds with the SEPTA managers; and (2) to maintain and increase business from SEPTA. The total loss to SEPTA is approximately $900,000.

**B.**     <u>**General Background Facts**</u>

SEPTA is a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the States of Delaware and New Jersey. SEPTA is an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance. In fact, in each of the years of the charged fraud, SEPTA received well over $100 million from federal sources.

Throughout the time of the fraud discussed in this memorandum, SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to managers working in SEPTA's BBD. The managers worked at various jobsites where SEPTA facilities were under construction for rehabilitation and renovation. SEPTA had established written rules and procedures that were provided to these employees concerning the use of these cards.

SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those materials and equipment that were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order process. The SEPTA Procurement Card Procedures Manual ("the Manual") specifically provided that the procurement card program was "not an alternative to, nor is it intended to circumvent, the normal procurement policies and

procedures."

Consistent with the purpose of the procurement cards, beginning in 2017, the Manual further limited the use of the cards to (1) $1,000 for a single transaction; (2) $4,000 for daily purchases; (3) and no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

### C.   The Fraud Activity

For many years, beginning around 2013, SEPTA managers with the BBD engaged in a fraud and bribery scheme with particular SEPTA vendors to defraud SEPTA by abusing SEPTA's P-Card system. The vendors provided SEPTA managers with cash and merchandise in exchange for vendors billing SEPTA for products that the vendors did not provide. The vendors shared in the proceeds of the fraud.

The two primary vendors involved in this fraud were MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI") and Advantage Industrial Supply ("AIS"). SEPTA records show that MSI was the highest biller on the SEPTA P-cards. From 2010 through 2019, MSI billed SEPTA approximately $3.7 million for products and tool repair services. The third highest biller during this period was AIS, charging SEPTA $1.9 million for industrial supplies. MSI was owned and operated by Mark Irvello. AIS was owned and operated by Stanley Woloff.

The scheme began around 2013 when defendant David Abell separately agreed, first with Irvello of MSI, and then with Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS without necessarily knowing why they were encouraged to use these vendors.

After agreeing to engage in this scheme, Abell regularly solicited and demanded cash payments from the vendors. Irvello and Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds

5

for themselves.

Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then falsely billed SEPTA for products that they did not provide to SEPTA. The bills appeared legitimate on their face because they were for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

Working with Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

Irvello and Woloff provided Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

Approximately one year before Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with

Rodney Martinez, making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the bribery and fraud scheme.

Irvello and Woloff then made regular cash payments to Abell and Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

Beginning on or about May 25, 2016, when Abell left the employment of SEPTA, Irvello and Woloff continued the fraud scheme with Rodney Martinez. That is, Martinez regularly solicited cash payments from Irvello and Woloff who provided cash to Martinez and fraudulently billed SEPTA through the P-Cards to cover the cash payments and the defendant's share of the fraud proceeds.

Around this time, Martinez invited defendant Jesse Fleck to join the scheme with Irvello and Woloff. At the request of Martinez, Fleck helped identify the items for which Irvello and Woloff would falsely bill SEPTA. Fleck then shared, in part, in the cash proceeds he obtained from Irvello and Woloff.

Several other SEPTA BBD managers, including those identified in the information, engaged in similar fraud activity with Irvello and Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost

7

of those payments and products and to generate additional fraud proceeds for the vendors.

From in or about 2013 through in or about 2019, Irvello and Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000. From in or about 2013 through 2016, during the time Abell participated in the fraud and bribery scheme, Abell obtained almost $100,000 in fraud proceeds and caused others to receive additional proceeds.

### III.    STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: Count One (theft from an organization receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count Two (bribery involving a program receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 20 years' imprisonment, a three-year period of supervised release, a $500,000 fine, and a $200 special assessment. Full restitution of $213,083 also shall be ordered.  Forfeiture of $96,291, which represents all proceeds the defendant obtained from the fraud and bribery offenses, also may be ordered.

### IV.    SENTENCING GUIDELINES

The government agrees with the sentencing guideline calculation for the bribery offense, which drives the guideline calculation in this case, as set forth in the Presentence Investigation Report ("PIR"): Under USSG § 2C1.1(a)(2), the base offense level for

bribery is 12. Under USSG § 2C1.1(b)(1), the offense involved more than one bribe or extortion, resulting in a 2-level increase to the base offense level. Under USSG § 2B1.1(b)(1)(F), the value of that which was obtained by the defendant and his co-schemers, and the loss to SEPTA is more than $150,000 but less than $250,000, resulting in a 12-level increase to the base offense level. under USSG § 3B1.1(a), the defendant was an organizer and leader of criminal activity that involved five or more participants and was otherwise extensive, resulting in a 4-level increase to the defendant's base offense level. The defendant accepted responsibility and did so in a timely manner, resulting in a 3-level downward adjustment under USSG § 3E1.1(a) and (b).

This results in a total offense level of 27. The defendant is in Criminal History Category I, yielding a sentencing guideline range of 70 to 87 months in prison.

### Consideration of the 3553(a) Factors

### (1)     The nature and circumstances of the offense

The nature and circumstances of Abell's criminal conduct are extremely serious and troublesome. Abell was the highest ranking member of the BBD and was responsible for numerous employees who reported to him. He owed SEPTA, his fellow employees, and the taxpayers a duty of loyalty and integrity. Instead of conducting himself appropriately, he abused that position of responsibility by originating and leading a bribery scheme. He brought others into the scheme who engaged in the bribery and theft activity for at least six years and causing losses to SEPTA of approximately $900,000. He and his fellow schemers helped themselves to hundreds of thousands of dollars in cash

and personal products with the corrupt vendors passing on those costs to SEPTA. If the scheme had not been uncovered, it would still be going on today.

Crimes like this do tremendous damage to federally funded agencies like SEPTA. They cause the taxpayers and citizens of Philadelphia to lose faith in the integrity of one of the largest metropolitan transportation organizations in the country. People are already cynical about government and government-funded entities like SEPTA, and internal fraud and bribery activity as charged in this case, fans the flames of this cynicism. Internally at SEPTA, these crimes demoralize the dedicated, honest, and hard-working employees who worked with and for the corrupt supervisors charged in this case. SEPTA has expended and will continue to expend substantial financial and psychic resources trying to repair the damage from the fraud and ensure that it does not happen again.

SEPTA provided a victim impact statement, signed by Denise S. Wolf, Inspector General, and Robin Deveney, Director, Procurement & Supply Chain Management Audit, in which they expressed the ways in which this crime damaged the organization:

> The criminal fraud executed by nine bad actors damaged this organization, its employees, and the members of the public who rely on us for their transportation needs. To put it simply, it hurt a lot. We still feel the impact --- financial loss, decreased morale, and damaged reputation -- and the effects of this fraud on the organization are not going away any time soon. SEPTA is not a for-profit enterprise; it relies heavily on funding from taxpayers to subsidize the fares received from riders. We depend on the integrity of each of our employees to steward these public funds and provide transit services to millions of riders. When employees – even if only a small number -- violate this public trust, the damage to our organization is tremendous.

This was obviously a serious crime that had a substantial impact on the victim, and the government's sentencing recommendation appropriately accounts for this sentencing factor.

**(2)     The history and characteristics of the defendant.**

David Abell is a 72-year-old man who had a normal upbringing and successful career at SEPTA. He raised two children with his third wife. The defendant does not have a current drug, alcohol, or mental health problem. However, he does suffer from chronic kidney disease and high blood pressure. He has no criminal history. Unlike so many cases that come before this Court, the defendant's personal history does not offer any explanation for his decision to engage in this criminal conduct. Clearly, the defendant should have known better.

To the defendant's credit, after initially denying his involvement in the scheme, he fully admitted to his misconduct and expressed remorse. The defendant is losing his pension as a result of his crimes. The government's recommended sentence properly accounts for the defendant's history and characteristics.

**(3)     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4)     The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

A prison sentence at or near the lowest end of the guidelines as recommended by the government under all the facts and circumstances of this case would appropriately

punish the defendant for victimizing SEPTA through his fraud and bribery scheme. The recommended sentence would promote respect for the law and deter public employees and business who serve public agencies from engaging in this type of fraud and bribery activity. Crimes like this are difficult to detect, as evidenced by the length of time that the defendant and others engaged in the crimes here, making it even more essential that the sentence deter those who might engage in this type of criminal activity.

As numerous courts have recognized, fidelity to the guidelines and imposing serious prison sentences serve a particularly important purpose in the area of white-collar crime.  For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals."  *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses").  In *United States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.' S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only

12

by a small fine that can be written off as a cost of doing business.' *Id.*

455 F.3d 1227, 1240 (11th Cir. 2006).

This is especially true here. The sentence imposed must communicate to Abell and

the public that the justice system will not tolerate this type of fraud and bribery activity.

The sentence recommended by the government, which amounts to significant prison time

for this first-time offender, would send the appropriate message to the community that

anyone who engages in fraud and bribery will suffer serious consequences.

**(5)    The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant with educational or

vocational training. Thus, this statutory factor should not affect the Court's sentencing

determination.

**(6)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Considering all the facts and circumstances discussed in this memorandum and

elsewhere, the recommended sentence would not result in any unwarranted disparities

among similarly situated defendants. The recommended sentence fairly considers this

defendant's conduct and the circumstances of his case and would be consistent with the

sentences of defendants in other cases of this nature, including that of other defendants in

this case. The government's sentencing recommendations for the participants in this

scheme reflect consider their relative culpability and the individual facts and

13

circumstances of each case.

Considering the relative culpability of the defendants in this scheme, David Abell, Rodney Martinez, and Stephen Kish are at the higher level of culpability among the SEPTA employees. David Abell was the Senior Director of Maintenance and the originator of the scheme. Abell was also a prolific participant, regularly obtaining cash from both vendors and encouraging his employees to purchase products for SEPTA from the corrupt vendors.  He brought Martinez into the scheme who then took over Abell's role as Senior Director of Maintenance and helped Abell continue to profit from the scheme after Abell left his high-ranking position and continued with SEPTA as a contractor. Martinez then regularly obtained cash and brought Fleck into the scheme to assist him in the false billing. Kish was a Director of Maintenance and below Abell and Martinez in the SEPTA hierarchy. Kish was the most prolific SEPTA manager in the fraud, obtaining over $250,000 in proceeds, much of it in the form of gold.

At the lower level of culpability among the SEPTA employees are James Turner, Jesse Fleck, John Brady, and Peter Brauner. They were lower-level managers than Abell and Martinez and they participated to a lesser extent in the fraud than Abell, Martinez, and Kish. Turner, Brady, and Brauner were Maintenance Mangers, the lowest level managers in the scheme.

The corrupt vendors in this case, Irvello and Woloff, should be considered more culpable than the lower-level SEPTA participants in the scheme because their conduct was far more extensive and involved repeated fraud and bribery activity over several

14

years. While they did not abuse the trust of the public and SEPTA as did the SEPTA managers, Irvello and Woloff were a substantial engine driving the criminal activity in the multiple schemes involved in these cases. Their culpability thus is closer to that of the higher-level SEPTA employees, but without the abuse of the public trust that represents the most abhorrent aspect of the criminal activity in this case.

The sentence recommended by the government in this case properly accounts for the relative culpability of Abell along with the other facts and circumstances of this case, discussed here and elsewhere.

**(7)** **The need to provide restitution to any victims of the offense.**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. Under the terms of the plea agreement, the defendant should be ordered to pay restitution of $213,083 and forfeiture of $96,291.

**V.** **GOVERNMENT'S SENTENCING RECOMMENDATION**

For all the reasons set forth above, the government requests that this Court impose a prison sentence at or near the lowest end of the guideline range of 70 to 87 months. This Court should also impose restitution and forfeiture as noted above. Such a sentence would properly consider all the sentencing factors in the context of this case, particularly the seriousness of the offense and the need to promote respect for the law and deter others

from engaging in similar illegal conduct.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*s/ Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been filed on ECF and served via email upon:

> Evan T.L. Hughes, Esquire
> One Penn Center
> 1617 JFK Boulevard Suite 2006
> Philadelphia, PA 19103
> E-mail: evan.hughes@hughesfirm.pro


> */s Louis D. Lappen*
> LOUIS D. LAPPEN
> Assistant United States Attorney


Date:  July 8, 2022